The next case is In Re. Filler, 2015-16-87. Mr. Filler, when you're ready. May it please the Court. So I'm Aaron Filler. I'm the inventor and the neurosurgeon, the And this invention, as you've seen from the briefs, had a tremendous impact. It was the first method to allow us to see the nerves. The board here focused on the surrounding tissue. And you're saying it did that with respect to Claim 3. Claim 18 does talk about surrounding tissue. You say that it did that with respect to Claim 3 because you, that misquoted the patent of the patent office. And the patent office made a mistake by accepting that quotation from Claim 3, right? Yes, and that's an error on my part. The error, it was introduced from our side and got copied into the appeal. So how can you complain about the error which you introduced? I withdraw that complaint. So the issue here, which I think raises confusion on the part of the PTAB and in the solicitor's reply, is the difference between a patent on the image and a method of making an image. So let's say, by comparison, we're talking about photography and the first film that's designed to make a color image. And we say, well, here before we have a camera that usually makes black and white, but sometimes we get a color image and therefore it's anticipated. But what's really novel in the color film is a method of bringing out a color image. So here we want to know, is there a method that selectively makes nerve bright as opposed to an ordinary MRI? What changes, what makes it selective for tissue? And this patent has anisotropy methods, which gave us diffusion tensor imaging, lets us see the internal structure of the brain. And none of those are under attack because it's extremely novel, the way that it was handled. Then we have claims that have to do with peripheral nerve imaging. And the insight there, because remember, you have the problem that MRI sees water. So how do you find something unique about the water in nerve to tune the MRI to that? So the insight is that in the nerve you have essentially oil and water. You have the fascicles, which are going to be bright, and intravasicular epineurium around them, which is fatty, and if you suppress it, it'll be black. And so this is what gives you selectivity. So you could, for instance, do what I call being like, an effect like the smile on the Cheshire cat, which is you suppress everything but leave that fascicular water signal standing. And even though you greatly decrease the total signal, you end up with a bright nerve emerging because you're being selective. What I explain in the appeal brief is I point to the language used throughout the patent to be lexicographic. That is, I say exactly what I mean by a neurogram, by comparison with an angiogram. I talk about what selective is going to be. And we then end up in the situation that you always struggle with is how does the claim language, the words that we have in English, bring the lexicography of the patent into the result, which we measure it by? So let's say we have a positron annihilation method that brings an oven to 46.8 degrees. We can't just say, well, we already have a method that achieves 46.8. That's the measure. That's the output. The nerve becomes brighter because we did something to it. But Mr. Filler, you're not addressing all these references. Middleton, Neskara, Neskarzadeh, Rappaport, and Neland all disclose images of nerves appearing enlarged or more distinguishable from non-neural tissue. Right. But the method by which they made bright is injury. So in order to do that as a method, and I see this because I do malpractice cases, you have to injure the nerve, and then it will become bright when the standard MRI. The question is, can you do something in the sequence that will make the nerve bright? So those were all references that were dealt with. I thought the board found that with respect to Middleton and these other references that  Well, this is my example of the camera. Yes, a method was used, a standard method, and sometimes the nerve is bright because it's injured. The question is, did they have a method that selectively makes nerve bright relative to other tissue, or do you have a standard method and sometimes you injure a nerve and therefore it's bright? That's the only method a person could use to achieve... I don't think that's a fair description of what the board found. Well, one reason why they get this wrong is they also thought that they were looking at Middleton. He's got 12 images. One or two of them show this nerve bright. They said, well, look, these are 10 different embodiments, and in any one embodiment, if one of the embodiments makes it bright, then that embodiment is anticipating. But really, it's a single embodiment which occasionally works. It only works if you have an injured nerve, and only sometimes if you do, because many of the injured nerves were bright. Basically, it's an occasional occurrence, and the reason it happened, as I explained in the reply brief, is a software error, which it was. That's not what the board found. Well, the board was wrong. That's why I'm appealing it. The question is whether substantial evidence supports what they did, not whether you think they're wrong. Well, it's not a substantial evidence question. The reason why I point out that it's a claim construction question is that the claim construction says that you have to do something that makes you selective for a nerve. That is, it's based on the method, and I say what the words mean. They want to use the common meaning of the words to look at the result. So they make no argument that there's any method that achieves this end, and it's a method claim. So, that's why I have the concern that by not having any expert testimony, and if you take the position of the solicitor that I waived lexicography and the specifications because I didn't claim them, that just can't be right, because we assumed... See, that's why you see that we were looking at anticipation until it got to the PTAB. The reason why we're looking, not anticipation, we were looking at inherency because we all understood the claim construction and that no one had made a method to be selective. So, what happens in the PTAB is they change the claim construction, and that's why they say, we don't need inherency. This is fully anticipated, which had not come up. That's before. That's why claim construction gets introduced in the PTAB decision, which we never got to comment on until the appeal to this group. Now, you say that you have method claims here, and that they distinguish over the references because the references dealt with tissue examined after accidents. Is that your point? That the only method they give of being selective... Do they give a method that is selective for nerve? Magnetic resonance. Well, this is my camera. The camera happens to make a color picture, but did we do anything that... Do we have a method of achieving color pictures? You have to have a method. You have to figure out, what do we do to make that happen? And they don't know why it happened. It happened once or twice. They thought these are cool images to put in an article, but they don't know how to do it. Where's the evidence that this happened once or twice? Well, because they then... I also give the evidence that they came back with a textbook five years later, and they didn't even put those images in. And then I have an affidavit from Neelan, who's one of the two authors, who said, we didn't know how it happened. After they saw my patent, they went back to try to figure it out. And with GE... That's a different point. They don't have to know why it happened. What you're suggesting is it only happened once or twice. And I'm asking you, what evidence in this record supports the notion that it was only happening once or twice? Well, they say in their article that they had two patients where the nerves turned up bright. One patient where they turned up bright, actually. Two images from one patient. That's what they... And they put it in. And they say... And he says it in the affidavit. He says it in the article. They're not sure why. You're saying the references are not enabling? Yeah, they're not enabling. They don't give you any method to do this. They don't know how it worked. And they wrote the textbook five years later. They didn't even mention it because they don't know how it happened. And I questioned him about it. He put it in his affidavit. We didn't know. So, for these reasons, I think it's important also to take a stand on the issue of lexicography and input from the specification because you cannot have claims that stand on just general meaning without the specification. So, thank you very much. We will save your rebuttal time, Ms. Craven. Thank you, Your Honor. May it please the Court. For the first time on appeal here, Dr. Filler argues that the claims, and specifically the claim terms, enhance selectivity and conspicuity of a nerve, meaning that you're generating a pure nerve, MR image. This nerve-specific construction, however, conflicts with Dr. Filler's very own broader ordinary meaning construction. I'm not sure he's arguing that. What he's saying is that the prior art references here is just one or two images that involve injured nerves, and that's not the same thing here, so it doesn't anticipate. That's not what the examiner in the board found. The examiner in the board found under his ordinary meaning construction argued before the board that the nerves, many of the images in Middleton and the other references, showed a nerve that was easily distinguishable from the surrounding non-neural tissue, and that meant the claim limitation, and that they were methods of using MRI to achieve the conspicuity that was claimed as construed under the ordinary meaning by Dr. Filler. Dr. Filler now is focusing just on figure 13, because as I read his brief, he's saying that's the only images that are nerve-specific, and that one was only found once, and it was an injured... Well, he's given up on the argument, as I understand it, that the nerve has to be distinguished from all the tissue in the image rather than just the surrounding tissue, and in those the tissue attended. So where does the board address this question of how many of the Middleton images show the enhancement that's found? So I think the board may have focused on just one of the images from Middleton, and then one image from each of the other four references. Let's see. Because the examiner then, maybe in the examiner's answer, the examiner answers focused on figure 2 and figure... In the examiner's answer, and this is at A, 1862, the examiner in the examiner's answer responded to these arguments by looking at figure 2 in Middleton and saying that that image, the nerve, the median nerve in the carpal tunnel is gray as opposed to the other surrounding tissue in the image, and the board then is addressing, based on the claim construction of that the nerve is easily distinguishable from non-neural tissue, affirming the examiner's rejection and anticipation rejection. The same is true for images from all the prior art under that ordinary meaning construction. So to the extent... Is it fair to say that not all the images from the prior art satisfy the 1.1 requirement? I think that's fair. I think it's Middleton, focusing on Middleton, was looking to image the contents of the carpal tunnel. One of the structures in the carpal tunnel is the median nerve. I think the examiner found that 80 to 90, but I'm not exactly sure the right number... You could distinguish the median nerve from the non-neural tissue, but not 100% of the images show that. Not all of the images show the median nerve, or some don't particularly point them out. Maybe one of Skill in the Art would be able to recognize a median nerve in those images, but the authors didn't particularly point it out. I'd like to also note that the claims are not limited to healthy nerves and not injured nerves. They cover images in which the nerve would be swollen or have edema. And so the point of the patent is to do diagnosis of nerves, and there's no reason to think that because a nerve is injured that that image should be excluded. Moreover, to the extent that Dr. Feller is arguing a nerve-specific image, for these claims that don't have the limitations that could get him there, the claims recite a 1.1 conspicuity limitation compared to the non-neural tissue. And dependent claims that are not on appeal here specifically recite an intensity of the nerve that is 10 times the non-neural tissue. And it is this intensity or this conspicuity that the specification, in fact, contemplates would be an image where the nerve is the brightest structure in the image. The claims also recite no specific MRI steps besides the T2 weighting in claim 3. And other dependent claims that are not on appeal here recite the specific techniques, fat vessel suppression and the fascicular imaging that Dr. Feller points to in his picture of a nerve-specific image of the sciatic nerve. But those limitations are simply not in the claims. Therefore, unless there's any other questions, we ask that the Board's anticipation decision be affirmed. Thank you, Ms. Clayton. Mr. Feller has five minutes if he needs it. I want to address a couple of things there. Firstly, of course, the claim isn't directed to being able to just identify a nerve. What Ms. Craven is saying is that there are some images here where an expert might be able to differentiate a nerve, but you want it to be brighter. And it doesn't require the 10 times. 10 times was we had 1.1, 5 times, 10 times. These are just progressively more stringent dependent claims. Because even at 1.1, we can make a pure nerve image if you're 1.1 times brighter than everything there, which is the smile on the Cheshire cat. That's all you need to get a pure nerve image out. So that's sufficient by itself. The issue about the various different claims is basically they all work to the same phenomenon, which is this checkerboard pattern of the nerve, the fascicle being bright, and then the knocked out fat being dark. So you see the fascicles, which is unique. But we claim it. Basically, there's four independent claims. One of them, Claim 1, which, remember, when this first came through from the requester, the examiner granted, rejected every one of the named claims, both on obviousness and anticipation, because the requester was just looking at, look, these images have been shown before. We immediately got the examiner to say, no, you've got to look for the method. The four methods are, Claim 1 specifically goes to a complex analysis of fascicles, and Claim 12 uses that along with fat suppression. In Claim 3 and 18, we describe it different ways. In Claim 3, we say, can you get there by using the parameters of nerve, which we lay out in the specification, without actually doing a specific fascicle analysis, which means that you could find an infringer who is not running through the detailed fascicle analysis but still using a method to make nerve bright. And in 18, we're saying you use it to distinguish the fascicle from the non-fascicular tissue immediately adjacent, which is where we use the word adjacent to tie into the claim, which is what I was fussing about in the sample claim. But that's still what we're up to in Claim 3 and 18. I take it that's it? That's it. Thank you very much. We'll take the case under advisement.